IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHAHARI MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 5208 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| CITY COLLEGES OF CHICAGO – OLIVE-HARVEY COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Shahari Moore sued City Colleges of Chicago – Olive-Harvey College ("City Colleges" or "College")[1] alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq. See* (Dkt. No. 1). Moore was fired from Olive-Harvey College after a disciplinary hearing for assigning a book in her course and others at the College that she had a financial interest in–specifically, for which she was earning royalties. Moore challenged her discharge through arbitration and the arbitrator affirmed the ethics violation but directed City Colleges to reinstate her after a suspension period. At the time of the original discipline, Moore filed this sex discrimination case alleging that City Colleges did not discipline male professors for the same ethics violation. Moore no longer disputes that her actions amount to an ethics violation but continues to claim that her original discharge was more accurately based on gender motivation. City Colleges moves for summary judgment asserting the College disciplined Moore for legitimate, non-discriminatory reasons and so she cannot prevail on her gender-based

---

[1] The Defendant asserts the proper employer-entity is the Board of Trustees of Community College District No. 508 County of Cook and State of Illinois doing business as City Colleges of Chicago aka Olive-Harvey College. (Dkt. No. 22, ¶ 3). For ease of reference and clarity the Court throughout refers to the Defendant simply as City Colleges. However, after a review of similar cases, the Court directs the Clerk of the Court to change the caption to reflect that the appropriate Defendant is the Board of Trustees of Community College District No. 508 doing business as City Colleges of Chicago – Olive-Harvey College. *See e.g., David v. Bd. of Comm. Coll. Dist. 508*, 846 F.3d 216 (7th Cir. 2017).

1

discrimination claim. *See* (Dkt. No. 41). For the following reasons City Colleges' Motion for Summary Judgment is granted. [41.]

## BACKGROUND

For the purpose of this motion, the following facts are viewed in a light most favorable to the non-movant, Moore here, and all reasonable inferences are drawn in her favor. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

Established under the Illinois Public Community College Act, City Colleges is a body politic that maintains and operates seven Chicago-area college campuses including Olive-Harvey College. (Dkt. No. 43, at ¶4-5) (Defs. SOF.)[2] During the relevant period, City Colleges employed Angelia Millender ("Millender") as President of Olive-Harvey College; Stephanie Tomino ("Tomino") as Associate Vice Chancellor of Human Resources; Tia Robinson ("Robinson") as Dean of Instruction; and Latasha Larry ("Larry") as Director of Human Resources. *Id.* ¶¶ 10-13, 32. Millender, Tomino, and Larry shared a role in the disciplinary review process at City Colleges. *Id.* ¶¶ 12, 13, 34.

City Colleges utilizes a "District-Wide Employee Manual" containing "Work Rules" that all employees are expected to follow. *Id.* ¶ 14; (Dkt. No. 44, Ex. C, at 241-46) (Exs. to Def.'s SOF.) All faculty employees are represented by [t]he Cook County College Teachers Union, Local 1600 AFT, AFL-CIO, which negotiated a Collective Bargaining Agreement ("CBA") mandating the faculty to "abide by [City Colleges] policies and Work Rules–including Ethics Rules that are a part of the Employee Manual." *Id.* ¶¶ 16-18; Ex. C, at 228-40.

---

[2] Dkt. No. 43 is Defendant's Local Rule 56.1 Statement of Facts; Dkt. Nos. 44 & 45 are Exhibits in support of Defendant's Local Rule 56.1 Statement of Facts; Dkt. No. 50 is Plaintiff's Local Rule 56.1 Statement of Additional Facts; and Dkt. No. 51 is Plaintiff's Response to Defendant's Statement of Facts.

2

The CBA contains an "Academic Freedom" section that contains two clauses: the first of which entitles faculty members to "freedom in the classroom in discussing [a given] subject ...; and a second section that gives faculty "the individual right and responsibility to determine course content and textbooks *subject to the applicable written departmental and College policy procedure*." (Dkt. No. 50, at ¶ 47 (Pl.'s SOAF); Dkt. No. 44, Ex. C, at 59) (emphasis added.)

As part of the departmental and College-wide policy, the Work Rules included the following prohibitions:

> 12. Engaging in a profession, business trade investment, occupation or other activity that results in a conflict of interest with present CCC employment.
> ...
> 21. Using one's official status as a public employee to effectuate the sale, disposal or exchange of property or other object of value belonging to any member of the public through fraud, theft or misrepresentation or complicity with others in such acts.
> ...
> 44. Violation of the CCC Ethics Policy.
> ...
> 48. Violation of departmental or College rules and regulations, including but not limited to departmental or College rules and regulations on telephone and computer usage.
> ...
> 50. Conduct unbecoming a public employee.

*Id.* As they relate to Work Rule 44, the Ethics Policy includes two relevant provisions: (1) a "Fiduciary Responsibility" section stating that faculty "shall at all times in the performance of their duties owe a fiduciary responsibility to the Board, to the students of the District and to the residents of the District;" and (2) a "Conflicts of Interest" section stating "[n]o employee or Board member shall make or participate in making of any decision or take any action with respect to any matter in which he has any special interest," wherein the term "special interest" is defined as "any 'economic' or other 'interest that is in any way distinguishable from the interests of the public generally ...'" (Dkt. No. 43, at ¶¶21-22; Dkt. No. 44, Ex. C, at 232-33, 236.)

Moore started working as a full-time faculty member at Olive-Harvey campus in 2001. (Dkt. No. 43, at ¶ 7.) She taught in the African-American Studies Department and eventually became the Department Chair in August 2014. *Id.* ¶ 8. Her disciplinary history is limited but includes verbal and written warnings for failure to complete mandatory Ethics Training in 2010, and discipline for a verbal altercation with a student in 2012. *Id.* ¶¶ 22-23; (Dkt. No. 50, ¶ 58.) In contrast, City Colleges appointed Moore to the Reinvention task-force in the Spring 2013 semester where she reviewed mathematics and English curriculums in order to "revamp and improve" them. (Dkt. No. 50, at ¶ 46; Dkt. No. 50, Ex. A, at ¶ 3 (Moore Affidavit.) Outside of her role as professor and Department Chair, Moore is the editor, publisher, and copyright owner of *Violets: A Collection of Inspirational Poems by the Women of Delta Sigma Theta Sorority Incorporated* ("*Violets*"). (Dkt. No. 43, at ¶ 25.) Given her authorship and ownership, she receives 70-percent of the revenue as royalties from sales of *Violets*. *Id.* ¶ 29.

As the Chair of the African-American Studies Department Moore possessed decision-making powers including selection of required reading materials for courses such as an Afro-American Studies 101 course taught by her and other adjunct professors. *Id.* ¶¶ 27, 30, 44; (Dkt. No. 50, at ¶ 49). In 2014, Moore made *Violets* required reading for the Afro-American Studies 101 courses and, as a result, sold 208 copies to Olive-Harvey students; netting her an estimated $4,400.57 during the Fall 2014 and Spring 2015 semesters. *See* (Dkt. No. 43, at ¶¶ 28, 30-31); *see also* (Dkt. No. 44, Ex. C, at 8) (Moore Dep.). Moore asserts that her basis for assigning *Violets* was because most texts concerning African-American studies were "beyond the reading levels of the students, many of whom arrived at [Olive-Harvey] with only a sixth[-]grade reading level."[3] *See* (Dkt. No. 50, at ¶ 50).

---

[3] City Colleges does not dispute this assertion but points out that it is merely Moore's own opinion and not a statement of fact. *See* (Dkt. No. 51, at ¶ 50).

4

After learning that Moore was assigning her own book for use in all the Afro-American Studies 101 courses City Colleges commenced a pre-disciplinary process in accordance with the applicable provisions of the CBA to determine whether Moore's actions violated portions of the Ethics Policy or Work Rules as a conflict of interest or self-profit. *Id.* ¶¶ 32-34. Specifically, the notice of her pre-disciplinary hearing stated:

> "The hearing is being held because, as Department Chair, you selected 'Violets' [] Edited by Shahari Moore; as the required text for AFRO AM 101 (African American Studies). As Department Chair, you are responsible for putting book orders into Akedemos (the College Online Bookstore) for all the Adjuncts within the African American Studies department. Your decision to select your "self-published" book as the required textbook is a conflict of interest because you positioned yourself to benefit financially from the sale of the book."

(Dkt. No. 45-1, Ex. A, at 1) (Copy of Pre-disciplinary Notice to Moore). The claims alleged by the College are supported after the fact by a subsequent arbitration decision describing Moore's rules violations as "ar[ising] out of the claim that [Moore], in her capacity as Chair of the Department of African American Studies, had included 'Violets' [] as required reading for all Introduction to African American Studies classes taught by all adjunct professors and a class taught by the [Moore] as a faculty member." (Dkt. No. 44-3, Ex. C, at 202) (Arbitration Decision.) City Colleges specifically cited sections 12, 21, 44, 48, and 50 of the Work Rules and conducted a hearing on the matter on January 22, 2015. *Id.* ¶¶ 35-36. The Hearing Officer found that Moore violated the Work Rules and recommended termination, which President Millender approved on February 25, 2015. Tomino and Larry also reviewed and approved the report and recommendation terminating Moore, and so City Colleges fired her on February 27, 2015. *Id.* ¶¶ 36-38-40.

Moore's Union filed and won a grievance against the College resulting in an adjustment of her punishment from termination to a suspension without pay. *Id.* ¶¶ 41-42. Per the Arbitrator's findings, City College's had just cause to discipline Moore because of explicit ethics policy and

5

rules violations for requiring the use of her book in the Intro. to African Studies courses. (Dkt. No. 44-3, Ex. C, at 211). Specifically, the Arbitrator found that Moore should "have recognized there might be the appearance" of a conflict of interest by requiring the use of her own book in courses offered at the school. *Id.* Yet the Arbitrator also found Moore's discharge disproportionate punishment for the violation. *Id.* 214-215. The resulting recommendation was that she be reinstated as a faculty professor but not as a Department Chair based in part on a finding that, given her prior work history, Moore's violation did not comport with such a severe punishment. *Id.216-217;* (Dkt. No. 43, ¶ 42.) City Colleges reinstated Moore at Kennedy-King College (a separate City Colleges campus) on December 13, 2015. *Id.*¶ 43.

Meanwhile, in August 2015, Moore filed an EEO charge alleging sex-based discrimination for her discharge from Olive-Harvey College. (Dkt. No. 44, at 247). Moore submits that other faculty members, including one female professor, three male professors, and one other male Chair/professor all assigned or used books of which they had a self-interest, which City Colleges disputes for a lack of foundation as to when and how each alleged book was assigned in a given course. *Compare* (Dkt. No. 50, ¶¶ 59-63), *with* (Dkt. No. 51, at ¶¶ 59-63) (Defs. Resp. to SOAF). Moore states in her EEO charge that similarly situated males were not terminated for engaging in similar unethical behavior. *Id.* The EEOC issued its dismissal and notice of suit rights on February 18, 2016; concluding that her charge failed to establish any statutory violation. *Id.* at 255.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, here Young-Gooch. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But Young-Gooch "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017); *see also Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014).

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit – when "a non-moving party [must] respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *See Grant*, 870 F.3d at 568 (quoting *Harney v. Speedway Super America, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008); *Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Congress enacted Title VII of the Civil Rights Act of 1964 intending to "prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin, and ordained that its policy of outlawing such discrimination should have the 'highest priority.'" *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (internal citations omitted). Title VII prohibits an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Where a plaintiff alleges she is being treated differently based upon the fact that she is a female, such as Moore does here, she must prove that her employer had "a discriminatory motive for taking a job-related action." *Ernst v. Cty. of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016).

Proving discriminatory motive formerly required analysis of both direct and indirect methods, but the Seventh Circuit has since removed this evidentiary distinction for employment discrimination claims. *See Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Martin v. F.E. Moran, Inc.*, 2017 WL 1316255, at *10 (N.D. Ill. Apr. 10, 2017). Under the current approach the Court first assesses whether the Plaintiff established a prima facie case of discriminatory treatment, meaning she must prove (1) she is a member of a protected class; (2) she performed reasonably on the job in accordance with her employer's legitimate expectations; (3) that despite her reasonable performance she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also David*, 846 F.3d at 225. Where a plaintiff claims she has been disciplined more harshly than others, the second and fourth

8

prongs of the prima facie case merge to account for the flexibility of the *McDonnell Douglas* analysis. *See Flores v. Preferred Tech. Gp.*, 182 F.3d 512, 515 (7th Cir. 1999). In such cases the issue is "whether the plaintiff was singled out for discipline based on a prohibited fact" because, if so, then "it makes little sense ... to discuss whether she was meeting her employer's reasonable expectations." *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (quoting *Flores*, 182 F.3d at 515) (internal quotations omitted). If Moore succeeds, the burden shifts to the employer "to introduce a legitimate, non[-]discriminatory reason for the employment action." *Naficy v. Ill. Dep't of Human Serv.*, 697 F.3d 504, 5111 (7th Cir. 2012). If City Colleges supplies a legitimate, non-discriminatory reason then the burden shifts back to Moore to provide evidence that the employer's reason was pretextual. *Id.* at 511-12.

There is no dispute that Moore is a member of a protected class. *See generally* 42 U.S.C. § 2000e-2(a); *Hively v. Ivy Tech Comm. Coll. of Ind.*, 853 F.3d 339, 343 (7th Cir. 2017) (it is undisputed that one's gender – be it male or female – is a protected class concerning employment discrimination). Nor do the parties dispute that she suffered an adverse employment action when she was suspended without pay for ten months. *See generally Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). Left are City Colleges' arguments that Moore fails to satisfy the second prong–that she was meeting her employer's legitimate expectations; and the fourth prong – that similarly situated employees outside of her protected class were not terminated. *See* (Dkt. No. 42, at 3-4).

A. **Legitimate Expectations**

Under *McDonnell Douglas* the legitimate expectations element is crucial because an employer need not be "put to the burden of stating the reasons for [an employee's] termination" if the plaintiff fails to demonstrate she was not meeting her employer's legitimate employment

9

expectations at the time of termination. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002). The issue generally turns not on past performance, but on whether the employee was performing well at the time of termination. *Id.* at 329. The importance of this element, however, is tempered even when the record evidences, or the employee admits to, legitimate policy violations where a plaintiff alleges that other employees who are not a part of her protected class are not being punished for the same potentially illegitimate conduct. *See Curry*, 270 F.3d at 478.

Looking to Moore's circumstances, City Colleges conducted a disciplinary inquiry regarding her decision to require *Violets* for all Afro-American Studies 101 courses taught at Olive-Harvey. City Colleges also cites prior disciplinary conduct occurring in 2010 and 2012 in support of her failure to meet legitimate employment expectations, however these prior incidents—standing alone—would not suffice because past actions by themselves are not relevant to her actions at the time of termination. *Peele, 288 F.3d at 329*. As noted, the concern was the conflict of interest resulting from "Moore's decision to select [her] 'self-published' book as the required textbook ... because [she] positioned [herself] to benefit financially from the sale of the book." (Dkt. No. 43, at ¶ 34.) Although Moore cites for support to the CBA Ethics Policy permitting teachers a certain degree of individual freedom in the subject matter and means of teaching within a particular class, she omits the caveat to that policy which is that her individual freedom is "subject to applicable written departmental and College policy and procedure," *see* (Dkt. No. 50, at ¶ 47), and those policies and procedures include a prohibition on conflicts of interest and ethics violations.

Additionally, the record does not reflect any evidence suggesting that Moore did not—in fact—violate the policies and procedures of the College by profiting from the forced-purchase of her book for use in the courses offered by the African American Studies Department. In fact, she

admits to both requiring her book for courses offered at the College and to profiting from the sale of her book. It further is undisputed that the pre-disciplinary hearing with City Colleges leadership, and the subsequent neutral arbitration decision strongly suggests that Moore violated the Ethics policy and Work rules by making her own book required reading. However, because Moore claims that similarly situated individuals who are not a part of her protected class were not punished for the same adverse conduct, the Court also must determine whether she creates a genuine dispute of material fact as to the fourth prong of the prima facie case.

**B. Similarly Situated Employees**

To prove a plaintiff is similarly situated to a non-protected employee the plaintiff "must show that the individual is directly comparable to her in all material respects." *Burkes v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (internal quotations omitted). "Factors relevant to this inquiry include whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualifications." *Id.* Another factor includes the ability to show that the other coworker that was not terminated had a "comparable set of failings." *Id.* (quoting *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 530 (overturned on other grounds by *Oritz*, 834 F.3d at 765)). The analysis is a flexible one, requiring the Court to determine "essentially are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). That said, the issue turns on whether similarly situated employees were "treated more favorably by the same decision-maker." *Ellis v. United Postal Serv.*, 523 F.3d 828, 826 (7th Cir. 2008); *see also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) ([t]he similarly situated requirement "normally entails" the existence of a common supervisor).

Moore identifies Edward Davis, Ambrose Akinkunle, Sigfredo Reyes, Daniel Davis, and Richard Williams as "comparators" because they are full-time, male faculty members at City Colleges, all of whom have a financial interest in books she claims they require for use in classes they teach. *See* (Dkt. No. 50, at ¶¶ 59-63). She supports these allegations by going "beyond the pleadings" to produce evidence of similarly situated employees; attaching a personal affidavit, a short spreadsheet of professors assigning their own books, as well as what appear to be photocopies of two other books authored by male professors to her Response to the Defendant's Statement of Undisputed Facts. *See* (Dkt. No. 50, Ex. A, at 15-17; Ex. C; Ex. D; Ex. F); *see also Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004).

Despite these comparator examples, Moore does not point to other elements necessary to show that the College targeted her based on her status as a female. For example, Professors Davis and Williams worked at Malcolm X instead of Olive-Harvey. (Dkt. No. 50, at Ex. C.) As is the case, they do not report to the same supervisor as Moore. There is no record of Millender, as the final decision-maker at Olive-Harvey College, being in a position to conduct disciplinary hearings of professors at a different campus within the college and so they are not comparable to Moore. Moore also admits that she is unaware of whether Millender had any knowledge of other professors assigning their own books for coursework. (Dkt. No. 43, at ¶ 44.) She further provides no evidence that any of the other professors went through any sort of disciplinary hearing or whether they received any punishment for allegedly violating the same College rules and policies. While her "Personal knowledge ... [is] 'grounded in observation or other first-hand personal experience," her conclusion that male professors are not punished for similar activity, or that the College is singling her out based on her gender are more akin to "speculations, hunches, intuitions, or rumors about matters." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

Another issue, although not the primary focus of the pre-disciplinary hearing, is that the record reflects Moore assigned her book to more than just the courses she taught herself. There is no evidence supporting that Professors Manns, Akinkule, Reyes, Sengstacke, Bailey, or Williams did the same nor could they since there is no evidence they were the chairs of their departments. Without having the same ability to assign books for courses taught by other professors, she cannot demonstrate that they are in a comparable position as she.

In sum, Moore fails to provide evidence suggesting a genuine issue of material fact that any other faculty members were similarly situated and so she does not prove up her prima facie case for age discrimination.

## C. Legitimate, Non-discriminatory Basis for the Adverse Action

Having established that Moore fails to prove a prima facie case of employment discrimination, the Court need not reach the pretext inquiry. *See Peele*, 288 F.3d at 327 ("[i]f a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry").

Yet, even if Moore satisfied her prima facie burden, City Colleges provides "a legitimate, non-discriminatory reason for its adverse employment action." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000). Moore violated the Ethics Policy and the Work Rules, and no factual dispute exists to the conclusion – as made by a pre-disciplinary Hearing Officer, by the Olive-Harvey administration, and by the Arbitrator – that Moore violated legitimate work policies. Additionally, Moore provides insufficient evidence to demonstrate that City Colleges' stated reason was a pretext for discrimination. *Id*. Moore's opinion that her actions do not rise to an actionable level including suspension or termination are immaterial and are not relevant for summary judgment. *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 900 (7th Cir. 1999) (an employee's

opinion about her employer's reason for termination is not determinative in analyzing the existence of pretext); *see also Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 724 (7th Cir. 2008) (a court should not sit as a "super-personnel department" when considering an employer's decision whether or not to take an adverse employment action ).

## CONCLUSION

The record, assessed in its entirety, does not contain sufficient evidence to permit a verdict in favor of Moore on her claim of sex-based employment discrimination in violation of Title VII nor does it present any issue of fact for a jury to decide. Accordingly, the Motion for Summary Judgment filed by City Colleges is granted. [41.]

                                                                          _____
                                                                          Hon. Virginia M. Kendall
                                                                          United States District Judge

Date: September 5, 2018